671 So.2d 958 (1996)
Charles ABBYAD and Jill Abbyad d/b/a The Chimes Cottages
v.
The MATHES GROUP, a Professional Architectural Corporation, and Jeffrey Thomas Avegno, Inc.
No. 95-CA-1543.
Court of Appeal of Louisiana, Fourth Circuit.
March 14, 1996.
*959 House, Golden, Kingsmill & Riess, W. Richard House, Jr., Randal R. Cangelosi, New Orleans, for Plaintiffs-Appellants Charles Abbyad and Jill Abbyad d/b/a The Chimes Cottages.
William E. Wright, Jr., Deutsch, Kerrigan & Stiles, New Orleans, for Defendant-Appellant The Mathes Group, a Professional Architectural Corporation.
Before KLEES, BYRNES and MURRAY, JJ.
KLEES, Judge.
Plaintiffs, Charles and Jill Abbyad ["the Abbyads"], initiated this suit against The Mathes Group ["Mathes"] and Jeffrey Thomas Avegno, Inc. ["JTA"], alleging that the defendants were negligent in rendering certain architectural and engineering services during the renovation and expansion of plaintiffs' home, which they also operated as a bed and breakfast. Mathes reconvened seeking *960 unpaid fees the Abbyads allegedly owed for the architectural services performed.
In November 1994, following a five-day trial, the jury found Mathes to be 70% at fault, the plaintiffs to be 25% at fault, and the plaintiffs' contractor, Gill Gagnon (not a party to the suit) to be 5% at fault. The jury did not assign any percentage of fault to JTA. Additionally, the jury found plaintiffs had incurred $95,000 in pecuniary damages, and declined to award plaintiffs any amount for mental anguish. Finally, the jury found that plaintiffs owed Mathes $4,000 for architectural services rendered.
On February 7, 1995, the trial court rendered judgment in accordance with the jury findings, awarding plaintiffs $62,500 plus interest and costs. Both Mathes and the Abbyads have appealed this decision. Each side contends that the jury's findings with regard to the allocation of comparative fault and the amount of damages are clearly erroneous. After reviewing the record, we find no manifest error in the jury's conclusion.

FACTS
In April of 1991, the Abbyads met with several architects of Mathes to discuss additions the Abbyads wanted to make to the Chimes Cottages, a bed and breakfast operated by them at their residence, which consisted of a one-story, five-room house and a detached two-room cottage. At this meeting, the Abbyads expressed their desire to add a second floor to the main house plus attic space which could be converted into bedrooms and a bathroom for their children. On the advice of Charles Montgomery, one of the Mathes architects, the Abbyads decided to include in the project two five-foot wings, one on each side of the house, to make it appear more symmetric. The Abbyads stated that their budget for the project was about $125,000. Although Mathes initially wanted a percentage of the cost to perform full architectural services on the project, it was eventually agreed that Mathes would be paid approximately $2,500 to $3,000 to design the additions, draw all the plans and obtain the necessary permits. The Abbyads indicated that they did not need full architectural services, which would include contract administration, presumably because they had already hired a general contractor named Gill Gagnon to oversee the project. Mr. Gagnon was present at the initial meeting between the Mathes architects and the Abbyads. Mathes hired co-defendant JTA, an engineering corporation, to assist with the structural engineering aspects of the project.
As the project progressed, two problems were encountered that plaintiffs claim made it necessary in August of 1991 for them to abandon the project as originally envisioned, demolish the first floor structure, and start over. About August 2, 1991, after the house had been raised and a new foundation had been poured, the Abbyads' framer discovered a "notched joist" condition, which had to be corrected before the work could progress. Mr. Abbyad contacted Mathes, who sent out someone to investigate. Mathes' proposed solution was to install "joint hangers," which suggestion was incorporated into a new set of plans submitted August 24, 1991.
On or about August 26, 1991, after the roof had been removed from the house, a more significant problem occurred when the Abbyads learned that the second floor and attic space could not be added without replacing the existing 2 × 4 studs in the walls of the first floor with 2 × 6 foot studs, which were required to obtain a city permit. At this point the Abbyads decided that the project as originally envisioned was not feasible, and within two days they had the house demolished.
The lawsuit filed by the Abbyads against Mathes and JTA was based on the allegation that the defendants were negligent in failing to discover and make known to them at an earlier time these two conditions, the notched joists and the need for 2 × 6 foot studs. Plaintiffs allege particularly that the lack of 2 × 6 foot studs made it impossible for the first floor to support the planned addition, and that had they been made aware of this fact, they would have never commenced the project.

Liability
Mathes contends on appeal that the jury's allocation of 70% of the fault to Mathes is too high; conversely, plaintiffs contend that the jury should have assigned 100% of the fault *961 to Mathes and/or JTA. Plaintiffs argue that the jury erred not only in assigning 25% fault to the Abbyads, but also in assigning 5% to Gill Gagnon, a non-party, and in assigning none to JTA. After reviewing the record, we find no manifest error in the jury's determination of fault.
The record clearly contains sufficient evidence to support the jury's finding of 70% fault on the part of Mathes. The Abbyads were told by architect Mark Gates of Mathes in April of 1991 that the existing structure of the house would support a second story and attic. Between April 26, 1991 and June 29, 1991, neither Mathes nor JTA ever conducted any measurement of the wall studs. On June 3rd, Mathes applied to the city for a permit to raise the Abbyad's house, which permit was issued on June 5th. The Abbyads began raising the house. On June 29th, Mr. Thomas of JTA submitted foundation drawings and at the same time sent Mark Gates of Mathes a note saying "we still need to determine bearing wall studs". According to Mr. Abbyad, Gates examined the wall studs in early July and at that time indicated to Mr. Abbyad that as long as the studs were "true" two-by-fours, they would be sufficient to support the second story addition. This advice was proven at trial to be a clear violation of the New Orleans Building Code. The need for 2 × 6 foot studs was first indicated in a set of plans submitted to the city permit office on July 15th, but plaintiffs contended they were not made aware of this fact until late August. Plaintiffs' expert, Stephen Craig Ratley, testified that by waiting so long to measure the wall studs, Gates breached the standard of care required of an architect.
In view of this evidence, we find the jury's assignment of 70% to Mathes to be reasonable. It was also reasonable for the jury to find no fault on the part of JTA, as the record is devoid of any evidence which indicates that JTA's conduct fell below that required of the engineering profession. In response to Mathes' arguments, we also find the jury's decision to apportion 25% of the fault to the Abbyads to be reasonable in light of the record. Although Mr. Abbyad testified that he felt he had to demolish his house because it was no longer feasible to continue as planned, the record does not fully support this. Plaintiffs' own expert, Mr. Ratley, admitted that it would have been feasible and consistent with the Abbyads' original project to have installed the 2 × 6 foot studs. Therefore, the jury could have reasonably inferred that the Abbyads' decision to tear down the house was impulsive, and therefore assigned them 25% of the fault.
Finally, plaintiffs contend it was legal error for the trial court to allow the jury to consider the fault of Gill Gagnon, who was not a party to the lawsuit. In support of this contention, plaintiffs cite Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La.6/30/95); 657 So.2d 975. In that case the Supreme Court held that it is neither necessary nor appropriate to quantify the fault of an employer in a tort case wherein the employer is immune from liability under the Workmen's Compensation Law. Id. at 982. After stating that it was appropriate to consider the fault of a settling tortfeasor and not appropriate to consider the fault of the aforementioned statutorily immune employer, the Court said in dicta:
It is generally neither necessary nor appropriate to quantify the fault of other non-parties (except persons whose negligence is imputable to the plaintiff or to a defendant).
Id.
We do not find this statement to be sufficient authority to declare error on the part of the trial court in the instant case. The record does not disclose the reason why the plaintiffs chose not to sue Gagnon. Nevertheless, the record reflects that plaintiffs had given Gagnon general responsibility to oversee the project and that he also was in a position to discover the structural problems earlier, yet he failed to do so. As the Abbyads' contractor, Gagnon's negligence could conceivably be imputed to plaintiffs. Therefore, the quantification of his fault was not improper.

Damages
Mathes contends that there is manifest error in the $95,000 figure set by the jury for damages suffered by the Abbyads. *962 According to Mathes, this figure is clearly wrong because the trial judge committed reversible error, first in allowing Mr. Abbyad, a lay witness, to give opinion testimony as to the cost of rebuilding his home, and second, in permitting evidence on the cost of items which were within the scope of the original project. Article 701 of the Louisiana Code of Evidence provides that a non-expert witness is allowed to state his opinion or inferences only when such are: "(1) rationally based on the perception of the witness; and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue." The trial judge stated on the record that he allowed Mr. Abbyad to testify because Code of Evidence Article 602, which must be read in connection with Article 701, states that a witness may testify only as to matters which the evidence shows are within his personal knowledge. The trial court believed that because Mr. Abbyad had seen the project through to completion and had paid the bills, it was appropriate for him to testify.
We do not find that the trial court's allowance of this testimony was reversible error. Mr. Abbyad's testimony reflected his firsthand experience in dealing with the project, and much of his testimony was backed up by documentary evidence. With regard to the scope of the testimony, it was not reversible error for the court to permit evidence on the actual cost of rebuilding, as long as the jury was properly instructed as to what is actually recoverable under the law. Moreover, we do not find the figure of $95,000 to be clearly wrong in view of the evidence. According to the testimony, the total project wound up costing approximately $240,000, which is $115,000 more than the Abbyads' original estimate of $125,000. Mr. Abbyad also testified as to other costs he incurred, including some alterations to the front of the cottage, lost income from the bed and breakfast, interest charges from an unplanned loan he took out, and a penalty he incurred for early withdrawal of a portion of his IRA principal. According to the testimony, these additional expenses amounted to nearly $40,000.
Mathes objected to the trial court's allowance of Mr. Abbyad's testimony; however, defendants presented no evidence or expert testimony to refute Abbyad's conclusions. Therefore, considering the record, we conclude that the $95,000 figure is not manifestly erroneous.
For their part, the Abbyads contend that the judgment is manifestly erroneous because the jury failed to award any amount on their claims for mental anguish and for pecuniary damages and attorney's fees caused by Mathes' alleged violation of the Louisiana Unfair Trade Practices Act. Plaintiffs also contend that it was manifest error for the jury to award Mathes $4,000 in fees. We find no merit in these contentions.
Although there was ample evidence showing that the Abbyads suffered mental anguish and emotional distress over the destruction of their home, there was also evidence indicating that the destruction of the home may not have been absolutely necessary under the circumstances. The jury could have reasonably concluded that the Abbyads' decision to demolish the house was premature and/or imprudent. Therefore, we do not find the jury's decision to reject the mental anguish claim to be clearly wrong.
As to the unfair trade practices claim, which was based upon Mathes' having sent the Abbyads an unreasonably high bill for services rendered, we find that the jury's decision was not error. The evidence showed that the Abbyads never paid the bill, or even considered paying it. There is no evidence to show that they incurred actual damages due to the alleged unfair trade practices. Therefore, the trial court properly declined to award either damages or attorney's fees, which are not recoverable under the Unfair Trade Practices Act when the claimant has failed to prove damages. Faris v. Model's Guild, 297 So.2d 536, 540 (La.App. 4th Cir.1974), writ denied, 302 So.2d 15 (La. 1974).
Finally, plaintiffs argue that the $4,000 fee awarded to Mathes is unwarranted. Because the plans drawn by Mathes were used to obtain the necessary building permits, it is clear that Mathes is owed some amount for its services. Although $4,000 seems high, it is not a completely unreasonable figure under *963 the circumstances, and we cannot say that it is clearly wrong or manifestly erroneous.
Accordingly, for the reasons given, we affirm the judgment of the trial court.
AFFIRMED.
BYRNES, J., concurs.
BYRNES, Judge, concurs.
I respectfully concur in the result reached by the majority because I agree that Gagnon's negligence can be imputed to the plaintiffs.
I disagree only with the majority's view that it is permissible to quantify the liability of a non-party, non-settling tortfeasor whose liability can be imputed to neither the plaintiff nor the defendant. The majority dismisses the following language from Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La.6/30/95); 657 So.2d 975, 982 as dicta lacking in persuasive force:
It is generally neither necessary nor appropriate to quantify the fault of other non-parties (except persons whose negligence is imputable to the plaintiff or to a defendant).
I might agree with the majority's view of this statement from Cavalier had not the Supreme Court proceeded in the next paragraph to demonstrate that that statement was the conclusion reached after careful consideration of and reflection upon the implications and policy issues involved:
As noted in the Uniform Comparative Fault Act comments, both plaintiffs and defendants have considerable incentive to join in the action as defendants or third party defendants any persons who may be joint tortfeasors. Plaintiffs generally will want to join any person that the jury may find liable, especially since the Legislature has reduced the solidary liability of each negligent joint tortfeasor to fifty percent. Both plaintiffs and defendants are benefitted when more parties are found to be at fault, because less fault will be attributable to contributorily negligent plaintiffs or to other joint tortfeasors, and contribution will be available against more persons. Furthermore, a finding of fault against a person not a party to the action is not binding on that person, and the plaintiff cannot recover against that person nor can the defendants obtain contribution from that person. Because of these considerations, juries should not be required to quantify the fault of a person that no party sees fit to join in the suit as a defendant or a third party defendant unless there is a compelling reason, such as in the case of a settling tortfeasor.[1]
Id.
Therefore, even though this language from Cavalier cannot technically be described as the holding of the Supreme Court, it gives a clear indication of the Supreme Court's view on this issue and should be given great weight by this Court.
NOTES
[1] Another example might be where another joint tortfeasor is known to exist, but the identity of that tortfeasor may be unknown. This could explain why the Supreme Court went to such trouble in Veazey v. Elmwood Plantation Assoc., Ltd., 93-2818 (La.11/30/94); 650 So.2d 712, in discussing the fault of the rapist who does not appear to have been named as a party in that suit.